AO 91 (Rev. 11/11) Criminal Complaint

**Sealed**
**Public and unofficial staff access to this instrument are prohibited by court order**

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

United States Courts
Southern District of Texas
**FILED**
*January 20, 2022*
Nathan Ochsner, Clerk of Court

| United States of America | ) |
|---|---|
| v. | ) |
| ASHOK JAIN, M.D. | ) Case No. |
| | ) |
| | ) **4:22-mj-134** |
| | ) |
| *Defendant(s)* | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __January 20, 2022__ in the county of __Harris__ in the __Southern__ District of __Texas__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1347 and 2 | Health Care Fraud |

This criminal complaint is based on these facts:
See attached Affidavit in support of the Criminal Complaint.

☑ Continued on the attached sheet.

*Complainant's signature*

Marguerite Hackney, Special Agent, FBI
*Printed name and title*

Sworn to before me telephonically.

Date: 01/20/2022

Frances H. Stacy
United States Magistrate Judge
*Printed name and title*

City and state: Houston, Texas

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Marguerite Hackney, your affiant, being duly sworn, do depose and state as follows:

### A. Identity and Experience of Affiant

1. Affiant has been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for over twenty years. During this time period, the majority of my investigations have focused on Health Care Fraud matters, and I am currently assigned to a Health Care Fraud squad in the Houston Division.

### B. Purpose of the Affidavit

2. This affidavit is made in support of a complaint and arrest warrant for ASHOK JAIN, M.D. ("JAIN").

3. This case is being investigated by the FBI, the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), and the Texas Office of Attorney General, Medicaid Fraud Control Unit ("MFCU").

4. The information set forth herein is based upon my personal observations, my training and experience, discussions with other law enforcement agents and officers, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from witnesses, and reports prepared by individuals familiar with the subject of this affidavit.

5. Because this affidavit is provided for the limited purpose of establishing probable cause for an arrest, it does not include every known fact concerning this investigation, but rather sets forth only those facts that I believe are necessary to establish probable cause. All figures, dates, and calculations set forth herein are approximate.

1

### C. The Charge

6. Federal law makes it a crime to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud a health care benefit program, as defined in Title 18, United States Code, Section 24(b), here, Medicare or Medicaid, or to obtain, by means of false and fraudulent pretenses, representations, or promises, money, or property owned by, or under the custody or control of, said healthcare benefit program, in connection with the delivery of or payment for health care benefits, items, or services, in violation of Title 18, United States Code, Sections 1347 and 2.

### D. Jurisdiction

7. This Court has jurisdiction to issue the requested arrest warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### E. The Medicare Program

8. The Medicare Program ("Medicare") is a federal health care program providing benefits to persons who are the age of 65 or older or disabled. Medicare is administered by the United States Department of Health and Human Services ("HHS") through its agency, the Centers for Medicare & Medicaid Services ("CMS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is a health care benefit program, as defined by 18 U.S.C. § 24(b).

9. Medicare "Part B" covers certain eligible medical services provided by an attending physician or other outpatient services rendered by a qualified Medicare provider. Payments for physicians under Medicare Part B are typically paid directly to the providing

physician or clinic based on claims submitted to Medicare for qualifying medical services that have been provided to Medicare beneficiaries.

10. Physicians, clinics, and other healthcare providers that provide services to Medicare beneficiaries are able to become Medicare providers. Part of this application process requires that health care providers certify they understand and will abide by the federal laws and regulations governing Medicare.

11. A health care provider that has received a Medicare provider number is able to file claims with Medicare to obtain reimbursement for medically necessary services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Medicare number, the services that were provided to the beneficiary, the date the services were provided, the cost of the services, and the name and identification number (known as a "National Provider Number" or "NPI") of the physician or other health care provider that ordered and rendered the services.

12. CMS does not pay Medicare claims submitted by Medicare providers directly. Instead, CMS contracts with different Medicare Administrative Contractors ("MAC") to administer Medicare Part B throughout different parts of the United States. In Texas, the MAC with jurisdiction over Medicare Part B claims is Novitas. CMS also contracts with Qlarant, a Unified Program Integrity Contractor ("UPIC"), to review providers' claims for potential fraud, waste, and abuse within Medicare and the Medicaid program.

13. Medicare Part B typically reimburses 80 percent of the allowable charges for a participating physician who provided physician services to a Medicare beneficiary. The remaining 20 percent is an un-reimbursed "copayment," which has to be paid by the Medicare beneficiary or another co-insurance maintained by the Medicare beneficiary. If a Medicare

beneficiary is also covered by his or her state of residency's Medicaid program—often referred to as "dually eligible"—the Medicaid program pays the remaining 20 percent.

### F. The Medicaid Program

14. The Texas Medical Assistance Program ("Medicaid") is a joint shared funding federal-state entitlement program that was implemented in 1967 under the provisions of Title XIX of the Federal Social Security Act of 1965 and Chapter 32 of the Texas Human Resource Code. Medicaid is a health care benefit program, as defined by Title 18, United States Code, Section 24(b).

15. Medicaid is a health insurance program funded predominantly by the United States Government with the remainder funded by the State of Texas and administered by the State of Texas. Medicaid helps pay for reasonable and necessary medical procedures and services provided to individuals who are deemed eligible under state low-income programs, among other criteria. Among the types of reimbursable medical assistance available to covered persons are physician services.

16. In order to participate in Medicaid, a provider must submit an application to the Texas Medicaid and Healthcare Partnership ("TMHP"). If the provider meets certain qualifications, TMHP will approve the application, enter into a written contract with the provider, and issue a unique provider identification number to the provider. By entering into a contract with Medicaid, a provider agrees to abide by the policies and procedures of Medicaid.

### G. Medicare Coverage of Transcranial Magnetic Stimulation

17. According to Qlarant's Local Coverage Determination ("LCD"), which is a published policy statement regarding a specific service or item and when such service or item is appropriately reimbursable, Transcranial Magnetic Stimulation ("TMS") is a non-invasive

treatment that uses pulsed magnetic fields to induce an electric current in a localized region of the cerebral cortex in the brain to treat depression when other treatments have not worked. An electromagnetic coil is placed on the scalp and provides electrical current in alternating on/off pulses. Per the LCD, typically, TMS is performed daily Monday through Friday (weekdays) for 30 treatments preferably over 6 weeks, but not to exceed 7 weeks duration.

18. According to Qlarant's LCD, an order for TMS treatment (or retreatment) must be written by a psychiatrist (a medical doctor or doctor of osteopathic medicine), who has examined the patient and reviewed the patient's records. The treatment must be given under direct supervision of a qualified physician while the physician is present in the area and immediately available (although the physician does need to personally provide the treatment).

19. Providers are required to have supporting documentation for TMS in the patient's medical record that includes the legible signature of the physician or non-physician practitioner responsible for and providing the care to the patient. The medical record documentation must support the medical necessity of the services, the patient's clinical progress during treatment, that the qualified physician met with the patient face-to-face for the initial assessment and subsequent delivery and management, and when there has been a change in either the clinical or mental status of the patient. The qualified physician must use evidence-based validated depression monitoring scales to monitor treatment response and the achievement of remission of symptoms. The clinical record must reflect that the qualified physician provided direct supervision for these services.

### H. Psychiatric Solutions, P.C.

20. On April 8, 2021, agents executed a federal search warrant at 1201 Creek Way Drive, Suite C, Sugarland, Texas 77487. That premises was PSYCHIATRIC SOLUTIONS, P.C. ("PSYCHIATRIC SOLUTIONS"), ostensibly a medical practice operated by JAIN.

21. JAIN is a medical doctor licensed to practice in the State of Texas (license number K1483), with a registration date of on or about January 28, 1997, and an issuance date of on or about November 16, 1996.

22. According to Texas Secretary of State records, PSYCHIATRIC SOLUTIONS was incorporated on or about September 24, 2008.

23. According to Medicare records, PSYCHIATRIC SOLUTIONS requested enrollment into the Medicare program in or around 2009. PSYCHIATRIC SOLUTIONS was approved to be a Medicare provider and assigned Medicare ID# 8F21541. On multiple occasions, including on or about April 16, 2012 and on or about December 16, 2014, JAIN appears to have signed the certification statement in PSYCHIATRIC SOLUTIONS' Medicare application, attesting, among other things, that he had read and agreed to adhere to the requirements listed in the application and had read and understood the "Penalties for Falsifying Information," including a description of Title 18, United States Code, Section 1347, the health care fraud statute.

24. As part of the Medicare enrollment process, PSYCHIATRIC SOLUTIONS filled out several electronic funds transfer ("EFT") agreements with Medicare, which requested that the authorized official's name as well as the bank account information, including the routing and account number to deposit the checks. On or about May 7, 2015, JAIN appears to have signed the EFT for PSYCHIATRIC SOLUTIONS, which listed a BB&T bank account ending in x8399 that was controlled solely by JAIN ("BB&T 8399").

25. According to information obtained from Medicare, the only medical doctor (a medical doctor or doctor of osteopathic medicine) with an NPI associated with PSYCHIATRIC SOLUTIONS was JAIN.[1]

26. Between in or around July 2015 and in or around February 2021, PSYCHIATRIC SOLUTIONS billed Medicare approximately $11.9 million for services purportedly performed or directly supervised by JAIN. Medicare paid PSYCHIATRIC SOLUTIONS approximately $2.8 million for those services. These funds were deposited into BB&T 8399.

27. According to the Medicaid billing data, between in or around July 2015 and in or around February 2021, Medicaid paid PSYCHIATRIC SOLUTIONS approximately $121,775 for services JAIN purportedly rendered and ordered.

## I. Probable Cause to Believe the Crime of Health Care Fraud has been Committed

28. The investigation has revealed that Medicare, and Medicaid as a secondary payor, were billed for TMS, psychotherapy, psychiatric diagnostic evaluation, established patient office visits, and other services as if JAIN personally performed or directly supervised them when JAIN was out of the country.

29. A review of JAIN's travel records compared to Medicare billing data revealed that between in or around July 2015 and in or around July 2019, PSYCHIATRIC SOLUTIONS billed Medicare for services JAIN purportedly provided or supervised (in person) while travel records show he was out of the country at least in the following instances:

   a. JAIN left the country on or about December 24, 2015, and returned on or about December 28, 2015. PSYCHIATRIC SOLUTIONS billed Medicare

---

[1] Although a physician's assistant and two therapists have reassigned their benefits to PSYCHIATRIC SOLUTIONS, this affidavit only includes billing information for and descriptions of services that were billed as if JAIN personally performed them.

7

approximately $450.00, and was paid approximately $128.82, for TMS purportedly performed by JAIN while JAIN was in actuality outside the United States.

b. JAIN left the country on or about March 2, 2017, and returned on or about March 15, 2017. PSYCHIATRIC SOLUTIONS billed Medicare approximately $160,050.00, and was paid approximately $15,037.53, for TMS, psychotherapy, and established patient office visits purportedly performed by JAIN while JAIN was in actuality outside the United States.

c. JAIN left the country on or about June 24, 2017, and returned on or about July 2, 2017. PSYCHIATRIC SOLUTIONS billed Medicare approximately $61,000.00, and was paid approximately $9,309.36 by Medicare, and was further paid approximately $695.54 by Medicaid, for TMS, psychotherapy, and established patient office visits purportedly performed by JAIN while JAIN was in actuality outside the United States.

d. JAIN left the country on or about December 7, 2017, and returned on or about December 22, 2017. PSYCHIATRIC SOLUTIONS billed Medicare approximately $73,950.00, and was paid approximately $19,407.94 by Medicare, and was further paid approximately $343.23 by Medicaid, for TMS, psychotherapy, psychiatric diagnostic evaluation, and established patient office visits purportedly performed by JAIN while JAIN was in actuality outside the United States.

e. JAIN left the country on or about November 22, 2018, and returned on or about December 4, 2018. PSYCHIATRIC SOLUTIONS billed Medicare approximately $31,855.00, and was paid approximately $8,614.40 by Medicare, and was further paid approximately $525.06 by Medicaid for TMS, psychotherapy, and established

        patient office visits purportedly performed by JAIN while JAIN was in actuality outside the United States.

    f. JAIN left the country on or about July 7, 2019, and returned on or about July 23, 2019. PSYCHIATRIC SOLUTIONS billed Medicare approximately $62,495.00, and was paid approximately $23,787.18 by Medicare, and was further paid approximately $299.40 by Medicaid for TMS, psychotherapy, psychiatric diagnostic evaluation, and established patient office visits purportedly performed by JAIN while JAIN was in actuality outside the United States.

30. As part of its investigation, law enforcement interviewed several former employees of PSYCHIATRIC SOLUTIONS. Former Employee 1 was a therapist at PSYCHIATRIC SOLUTIONS, from in or around April 2018 to in or around September 2019, and was interviewed by law enforcement on or about January 21, 2020. Former Employee 1 said that TMS was conducted at all PSYCHIATRIC SOLUTIONS locations, including Lake Jackson, Sugarland, and Katy, even though JAIN was the only doctor. TMS would be done by the women in the offices even though they were not licensed to do the services. They were simply shown how to conduct TMS by JAIN. Former Employee 1 advised the patient files for the patients receiving TMS were not properly documented with all the required information. Former Employee 1 explained that JAIN would instruct the biller what to bill and change the billing if it did not fit his instructions.

31. Law enforcement conducted interviews with dozens of Medicare beneficiaries for whom PSYCHIATRIC SOLUTIONS billed Medicare for TMS services purportedly directly supervised by JAIN, approximately a dozen of whom were dually eligible beneficiaries for Medicaid (covered by Medicare and Medicaid as a secondary insurance). Multiple beneficiaries

reported never receiving TMS, but Medicare billing data reflects that their Medicare numbers were repeatedly billed for TMS. Other beneficiaries reported receiving TMS, psychotherapy, and/or office visits with less frequency or fewer times than billed to Medicare.

### J. Conclusion

32. Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from in or around July 2015, and continuing through at least in or around February 2021, in the Southern District of Texas, and elsewhere, ASHOK JAIN, M.D. committed violations of federal law, including Health Care Fraud, in violation of Title 18, United States Code, Sections 1347 and 2.

33. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Marguerite Hackney* (signature)
Marguerite Hackney
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 20th day of January 2022..

*Frances H. Stacy* (signature)
Frances H. Stacy
United States Magistrate Judge